**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**AISHA T. CRUMP**                                                                              **PLAINTIFF**

**V.**                                            **CAUSE NO. 3:19-CV-461-CWR-FKB**

**COMMERCIAL FURNITURE**                                      **DEFENDANT**
**INSTALLATION, INC.**

**ORDER GRANTING DEFAULT JUDGMENT**

Before the Court is the plaintiff's motion for default judgment. Docket No. 11. An evidentiary hearing was held on the motion on December 17, 2019.

Defendant failed to appear or respond in this action. As such, liability is not contested. The below findings of fact and conclusions of law support the nature and extent of damages awarded.

**I.**      **Findings of Fact**

Defendant Commercial Furniture Installation, Inc. ("CFI") installed office furniture for companies in the Jackson, Mississippi, area. Though not named as individual defendants in this matter, Jackie Armagost and John Haselhorst were 50/50 partners in CFI.

Plaintiff Aisha T. Crump, an African American woman, worked for CFI as a 1099 employee, *i.e.* an independent contractor, from December 2015 to March 2016. She was then placed on payroll as a full employee in March 2016, until her termination in May 2017. Crump filed for unemployment benefits. In December 2017, Armagost called Crump and requested that she come back to work for CFI. From December 2017 to September 2018, Crump went back to CFI, working as a 1099 employee.

While Crump was employed with CFI from December 2015 to March 2016, she worked as an installer–she helped install office furniture. CFI provided Crump with a uniform, instructed her when to show up to work, when to take breaks, when she was off work, and on every important

matter relating to her job's functions. CFI also provided Crump with the tools and equipment that she needed for installation projects, including but not limited to a drill, drill bits, and a tool bag. Despite all this, CFI paid Crump on an independent contractor basis, meaning she was on a 1099.

In March 2016, Crump was "moved to payroll" and was considered a CFI employee. Crump did not recognize the significance of being on a 1099 until she was on payroll. It was then Crump learned that CFI could not have an employee on a 1099 for more than a certain amount of time.[1] Her employment from December 2015 to March 2016 exceeded that time frame. Crump later learned that there were other employees at CFI who performed the same job as her but were on W-2s for their employment.

As of May 2017, Crump had been off CFI's installation schedule for months. So, she filed for unemployment benefits and received them. Crump testified that Haselhorst was "livid with me for filing my unemployment benefits." In December 2017, Armagost called Crump and asked her to come back to work for the company as an independent contractor. Armagost expressed concerns about CFI's finances and suspected that someone was stealing from CFI.[2] Crump returned to her installation job at CFI in January 2018.

Brenda Hollis, a white female, served as the Office Manager of CFI and was responsible for bookkeeping. On February 19, 2018, Armagost approached Hollis about the financial records. Hollis refused to turn them over, and consequently, was fired. Armagost could not get into Hollis's QuickBooks and so CFI had to buy a whole new system. CFI took Hollis's computer to the auditors, and the forensic accountants were able to open her QuickBooks.

Armagost offered Crump the position of Office Manager, which would include bookkeeping duties. Crump assumed the position on February 20, 2018. Armagost agreed to pay

---

[1] According to Crump, the maximum time period CFI was permitted to have an individual on a 1099 was 60 days.
[2] Armagost's wife, Jennifer Armagost, began keeping records of the jobs CFI did, starting in July 2017.

Crump $17.65 per hour. Crump accepted the job, but CFI did not put her on payroll. CFI once again employed Crump through 1099 status. Once Crump assumed the position of Office Manager, Armagost requested that she audit the financial records because Jennifer, Armagost's wife, who is an accountant, recognized irregularities that were not accounted for. Jennifer and Crump worked together to go over the books, and the numbers were not adding up.

Armagost suspected that Haselhorst was stealing money from the company while attempting to place blame on Hollis, the former Office Manager. Armagost asked Haselhorst to turn over financial records; Haselhorst refused. Crump, therefore, was placed in the middle of a dispute between Armagost and Haselhorst, CFI's two principals.

Haselhorst did not want to proceed with an audit, but Armagost insisted. The accounting firm Carr, Riggs, and Ingram was commissioned to help with the audit. CFI had $2 million worth of fraud and embezzlement insurance, and later in 2018, Armagost made an insurance claim about his concerns.

While Office Manager, Crump became fluent in Excel and QuickBooks. She learned that QuickBooks had a built-in fraud protection mechanism. If any changes were made to the financial records, they were visibly noticeable because the fonts would be different from the original entries. Crump also learned the inner-workings of the CFI's finances – specifically how CFI paid bills, where they were paid from, and how receipts were documented.

While in the position of Office Manager, Crump was in a similar position as Hollis had been. They were paid the same $17.65 an hour rate and were subject to the same job responsibilities and supervisors. However, Hollis had been on a W-2 and received health insurance. Crump did not receive any benefits, as she was employed as an independent contractor on a 1099.

On April 18, 2018 at 6:00am, Armagost called Crump and terminated her without explanation. At 7:15 am, Crump went to the office to pack up her things. Once at the office, she realized why she had been fired: Haselhorst and Hollis were back. Armagost apologized to Crump and said he needed to bring back Haselhorst and Hollis. Armagost said he was going to try to get Haselhorst to work with Crump and employ her in a different capacity.

While packing up her office, Crump overheard Armagost and Haselhorst talking about the financial books. Armagost acknowledged that the current status of the financial books was horrible and advised Haselhorst that Crump could really help Hollis with the bookkeeping. Crump then heard Haselhorst respond, "Brenda [Hollis] don't want her black ass working here."

After hearing this exchange, Crump left the office and promptly went to the U.S. Equal Employment Opportunity Commission ("EEOC") to file a charge of discrimination. That same day, Crump went to the IRS and turned over the CFI financial records she had. The EEOC called Haselhorst and Armagost. Once Haselhorst and Armagost realized that Crump filed a charge with the EEOC, they began attempting to contact her regularly. She refused to answer the phone.

On April 20, 2018, Crump went to the office to pick up her check, but Haselhorst refused to give it to her. Armagost acknowledged that CFI's financial books were horrible and asked Crump to not go to the IRS. Armagost offered to get Crump her old job back as an installer, but he said he could no longer pay her $17.65 per hour. Instead, he offered to pay Crump $13.00 per hour and assured her that she'd be scheduled for 40-hour weeks. Armagost also asked that Crump drop the EEOC claim. In response, Crump said she would have to consult with the person she had spoken with at EEOC.

The EEOC representative advised Crump to make sure Armagost and Haselhorst put in writing that they would pay her $13.00 an hour and schedule her for 40 hours of work a week.

4

Armagost wrote out and signed the agreement in pencil. Both Crump and Haselhorst were in the office with him when he did so. They told Crump to leave and go to the EEOC and drop the case and that they would pay her for today. They said she would start back at work the next day.

After accepting the offer to return to work, Crump was not sent on any installation jobs. The company stationed her, by herself, at the bottom of a hot warehouse that did not have any running water or a bathroom. When Crump tried to go to a higher floor to use the bathroom, Hollis would not open the door to allow Crump to enter. Crump complained to Haselhorst about these discriminatory conditions. Haselhorst told Crump that someone else would be at the front the next day. That did not occur, and Crump experienced these substandard work conditions for over a month. Crump could only go to the bathroom down the street, at the store.

Haselhorst and Hollis continued to harass Crump. Hollis would intentionally dispose of Crump's timecard, and Haselhorst threatened Crump with repercussions if she did not do exactly as he said. Crump testified that any time she came into the office, Hollis harassed her and racially discriminated against her. For example, Hollis said Crump's laugh sounded like a monkey. Hollis also followed Crump out of the office, taunting her.

While in the office, Haselhorst did not prevent Hollis's racial discrimination of Crump. Crump testified that Haselhorst did try to appease Crump, by keeping her on the schedule and sending other employees to pick her up at her house for jobs so she could avoid the warehouse. Other employees saw Hollis throw away Crump's timecard. Other employees complained about being on 1099 and were then put on payroll, but Haselhorst said that he could not put Crump on payroll because Hollis did not want her on payroll. Sometimes CFI would pay Crump in cash so that Hollis would not know Crump was being paid for 40 hours. Crump experienced emotional distress from the continued harassment.

Crump also believes she was retaliated against for reporting CFI's illegal financial conduct. She had complained of the conduct to Armagost and Haselhorst. Armagost asked her to not go to the IRS. For example, Crump complained to Haselhorst that in February 2017, Crump got a garnishment for unemployment for around $289. Even though the garnishment occurred in 2017, it appeared in CFI's QuickBooks in 2015. Additionally, Crump noticed that the QuickBooks said CFI paid $1.64 million to a car dealership, which stood out to her because CFI did not own enough vehicles to equal that amount. She also noticed it would list over $100,000 in costs of goods sold, which did not seem to align with how little they sold. The ledger also had entries saying, "loans from John Haselhorst." Crump saw that Haselhorst would get checks back for these "loans" but he was not actually loaning money to the company. In an email to Armagost, which Crump saw, Haselhorst told Armagost to get rid of Crump because she knew too much about CFI's financial irregularities.

Armagost and Haselhorst continued to pay Crump for 40 hours a week at $13 per hour as per the April 2018 agreement. However, at the end of July 2018, they stopped putting Crump on the schedule but continued to pay her in cash up until September 28, 2018. A few weeks prior to September 28, 2018, Armagost began to threaten Crump, saying that CFI did not have to pay Crump and that he did not care if she went back to the EEOC.

Crump went back to the EEOC and showed them the threatening texts she received from Armagost and Haselhorst and told them about not being put on the schedule and being paid in cash. Crump filed another EEOC claim. After that, Armagost texted Crump and said that CFI would give her $4,000 that day if she dropped her EEOC complaint and that she could come back to work in February of 2019 when Haselhorst left the company. Crump refused. Armagost continued to call her and ask her how much she wanted them to pay her to drop the EEOC claim.

Crump hired a lawyer at this point. Armagost and Haselhorst continued to call Crump. Even after Crump's lawyer sent notice to Armagost and Haselhorst to stop contacting Crump, they came to her house.

Crump was able to determine her 2016 and 2017 wages from QuickBooks information she had on a flash drive. In 2016, her wages totaled $34,321.16. In 2017, her wages totaled $7,723.34.

After she was terminated, Crump attempted to find employment. She applied to temp agencies and other jobs, but was unable to find one until December 12, 2019. From the entire ordeal, Crump experienced stress and emotional hardship. She says she gained weight from the stress and had symptoms that lasted more than a year. It was hard for her to get out of bed for several months.

## II.     Conclusions of Law

Crump filed this lawsuit on July 1, 2019. The first amended complaint was filed on July 15, 2019. The complaint, first amended complaint, and the original summons were served to the next day on Ronnie Hamlin, CFI's registered agent at the time. CFI failed to answer. Crump filed a motion for clerk's entry of default on September 12, 2019. The clerk entered default on September 16, 2019. Crump moved for default judgment on September 17, 2019. An evidentiary hearing was held on December 17, 2019, to determine the damages amount.

Crump also provided CFI's attorney Lee Watt with notice of the December 17, 2019, motion hearing, but CFI did not appear.

Crump's causes of action are for racial discrimination and retaliation under Title VII and § 1981, as she was treated differently than a similarly-situated white person on the basis of race, was subjected to severe or pervasive racial harassment, and was subjected to materially adverse actions

after complaining to the EEOC about that discrimination. Liability is not in dispute since CFI has chosen not to defend this action. The above Finding of Facts are uncontroverted.

### A. Plaintiff's lost wage claims for back pay and front pay

#### 1. Back pay

Once discrimination has been established, entitlement to back pay is presumed. "[A] Plaintiff or a complaining class who is successful [on the merits] should ordinarily be awarded back pay unless special circumstances would render such an award unjust." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 412 (1975).

"In general, back pay liability in a wrongful termination case commences from the time the discriminatory conduct causes economic injury and ends upon the date of the judgment." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 483 (5th Cir. 2007) (internal citations omitted). In a case like this, where discrimination led to Crump's wage reduction before her termination, it is reasonable to use her peak earnings rate for calculations. *See Palasota*, 499 F.3d at 484.

Crump has provided a spreadsheet of her payroll checks and a summary of her lost wage claim. *See* Docket Nos. 13-1 and 13-2. Crump worked from December 2015 to March 2016 on a 1099. She worked from March 2016 to May 2017 on a W-2. Then, she worked from January 2018 until September 2018 on a 1099. In early 2018, she was paid $17.65 an hour for 40 hour work weeks. On April 19, 2018, Crump's pay was reduced to $13, a loss of $4.65 an hour, until September 28, 2018, for a total of 162 days. Crump was terminated on September 28, 2018.

Crump is entitled to back pay from the time the discrimination caused her economic injury until the date of this judgment. Specifically, Crump is entitled to $4,304 for her reduction in wages from April 19, 2018 to September 28, 2018.[3] She is entitled to $17.65 per hour for 40 hours a

---

[3] $4.65 x 40 hours per week equals $186 in wages lost per week. There are 23.142 weeks from April 19 to September 28, 2018. $186 x 23.142 = $4,304.00. *See* P-1 listed at Docket No. 13-1.

8

week, for a total of $706 per week, from September 28, 2018, until December 12, 2019, when she mitigated her damages by beginning a new job at Park and Hannah as a stock liner. Crump is entitled to $44,276.29 for that period.

At the time of the December 17, 2019 hearing, Crump worked 40 hours a week and earned $15.60 an hour. She is entitled to the difference in her CFI pay ($17.65 for 40 hours a week) and her current pay ($15.60 for 40 hours a week) from the date she began her new employment until the date of this judgment, September 30, 2020. From December 12, 2019, to today spans 41.86 weeks where Crump earned $82 less a week than she did at CFI before her wage reduction, so she is entitled to $3,432.29 for this period.

In total, Crump is entitled to $52,012.58 in back pay ($4,304.00 + $44,276.29 + $3,432.29).

### 2. Front Pay

As Crump brings claims pursuant to § 1981, in addition to requesting damages under § 1981a, Crump seeks front pay. Front pay is an equitable remedy employed to account for future lost earnings. *Giles* 245 F.3d at 489-491. Reinstatement is generally preferred. *Weaver v. Amoco Prod. Co.*, 66 F.2d 85, 88-89 (5th Cir. 1995). The Fifth Circuit generally requires district courts to articulate their reasons for finding reinstatement infeasible and awarding front pay in lieu of reinstatement. *Id.*

In this case, it is plain that it would be infeasible to reinstate Crump to an environment where she experienced explicit racial discrimination, retaliation, and hostility from the named partners, including but not limited to them coming to her house to threaten her to drop her EEOC claim against CFI. Front pay is an appropriate alternative remedy.

The Fifth Circuit has held that awarding five years of front pay was within the district court's discretion. *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822-23 (5th Cir. 1990).

"Calculations of front pay cannot be totally accurate because they are prospective and necessarily speculative in nature." *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991). "The courts must employ intelligent guesswork to arrive at the best answer." *Id.* In *Reneau*, the Fifth Circuit instructed the district court on remand to consider factors such as "the length of employment, the permanency of the position held, the nature of work, the age and physical condition of the employee, and the myriad of other non-discriminatory factors which could validly affect the possible [employer/employee] post-discharge relationship." *Id.* at 871.

Crump worked for CFI for around 27 months in total. She is presently 37 years old. At the time of the December 17, 2019, hearing, Crump complained of physical symptoms caused by the stress and retaliation she experienced. She has been able to find employment, but it took her more than a year to find that position and it pays $2.05 less an hour.

In light of all these factors, the Court finds that Crump should receive front pay for 2 years, at a rate of $2.05 an hour (the marginal difference in wages) for 40 hours a week. This sum will bring her current income up to the pay she earned at CFI before the discrimination economically harmed her. Thus, Crump is entitled to $8,528.00 in front pay.

In total, Crump should be awarded $60,540.58 in lost wages.

## B. Compensation for mental health treatment

Crump went to see a therapist three times in October 2018. The sessions cost her $585. *See* Docket 13-5. Crump testified that she should have continued to see the therapist, but she could not afford more treatment.

The Court finds that the $585 should be added to her recovery.

### C. Compensation for non-economic compensatory damages

Crump has requested $500,000 in damages for pain and suffering. The majority of the evidence for this request is found in Crump's own testimony, though she has provided evidence that she saw a therapist for three visits. While juries within the Fifth Circuit have awarded substantial emotional distress awards, which the Fifth Circuit has affirmed,[4] this request is an outlier as compared to other amounts awarded in this circuit. This Court compares Crump's request to other, factually similar cases.

In *Turead v. Grambling State University*, the Fifth Circuit affirmed a $140,000 award of emotional distress damages to a law enforcement officer who accused his employer of retaliatory discharge. 294 F. App'x 909, 911-12 (5th Cir. 2008). The plaintiff, who was the only witness to provide testimony concerning the emotional distress he suffered because of the retaliation, described it as a "painful experience" and one which caused him to be "deeply hurt." He also testified that he "had the blues," he was stressed, and that the discharge was "emotionally embarrassing."

In this case, Crump testified that she experienced stress and emotional hardship. She said "[i]t was the worst experience of my life. It was just stressful. I mean, it was too much. I went to see a therapist. It was just too much and they wouldn't stop calling me." She says she gained weight from the stress; that it was hard for her to get out of bed for several months; and believed she needed further psychological treatment. Her medical records reflect that Crump reported symptoms of depression which she associated with a hostile work environment. Docket No. 13-5

---

[4] *See Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 (5th Cir. 2000) (upholding $100,000 compensatory damages award for emotional distress); *Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 262 (5th Cir. 1999) (affirming $100,000 award under the ADA for past and future mental anguish); *Minter-Smith v. Mukasey*, No. 3:03-cv-1057, 2008 WL 2164565, *11 (S.D. Miss. May 22, 2008) (remitting award from $300,000 to $150,000); *Chollett v. Patterson-UTI Drilling Servs., LP*, No. V-08-27, 2010 WL 3700833, *3-7 (S.D. Tex. Sept. 14, 2010) (refusing to remit award of $100,000 --$50,000 each for past and future compensatory damages).

at 14. Those symptoms included crying daily, increased anxiety, difficulty sleeping, and losing interest in daily activities. *Id.* at 16-24. The therapist diagnoses Crump with "adjustment disorder with mixed anxiety and depressed mood." *Id.* at 25.

In light of *Turead*, the Court believes that Crump has established a case for an award of damages of $140,000.

### D. Attorney's fees and expenses

#### 1. Attorney's fees

In evaluating a request for attorney's fees, the Court first calculates the "lodestar," defined as "the number of hours reasonably expended on this litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Abner v. Kansas City Southern Ry. Co.*, 541 F.3d 372, 376-77, 383 (5th Cir. 2008). "[T]he lodestar method yields a fee that is presumptively sufficient." *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1673 (2010) (citations omitted).

"The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed," *Hensley*, 461 U.S. at 433, and "bears the burden of showing reasonableness." *Abner*, 541 F.3d at 377. "[T]he burden is on the applicant to produce satisfactory evidence . . . that the reasonably requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (quotation marks and citation omitted) "Charges for excessive, duplicative, or inadequately documented work must be excluded." *Id.* (citation omitted).

The Court then adjusts the lodestar upward or downward by considering the 12 factors set forth in *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974). *Abner*, 541 F.3d

at 376-77. The "most critical" of these factors is "the degree of success obtained." *Id.* at 377. As a part of this analysis, the Court "explain[s] how each of the *Johnson* factors affects its award," although its discussion need not be meticulously detailed to survive appellate review." *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008); *see Blanchard v. Bergeron*, 893 F.2d 87, 89 (5th Cir. 1990) ("we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions on fee awards consume more judicial paper than did the cases from which they arose.") As the Supreme Court has explained, "trial courts need not, and indeed shot not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

The Michael R. Brown Law Offices represented Crump in this matter. According to Docket No. 13-6, Brown has charged 67.75 hours for this representation at a rate of $300.00 per hour. Thus, his attorney's fees are $20,325.00. These fees are pursuant to his agreement with Crump. After reviewing the attorney's billing statement, the Court finds that Brown reasonably expended 67.75 hours on this representation.

The next question is whether $300 is an appropriate hourly billing rate for Brown. Brown has been practicing law for 22 years and has been in his own firm since 2003. He testifies that he has worked on complex and extensively-litigated cases. Brown has sought to justify his fee by submitting an affidavit from attorney Joseph Lott Warren, who states that he worked with Brown on a complex land dispute involving large parcels of farmland with an amount in excess of $1,000,000.00 in controversy. *See* Docket No. 18 at 1. In that case, Mr. Warren stated that Brown "exhibited a high degree of knowledge, skill, and ability." *Id.* Warren testified that an amount of $300 an hour would be "reasonable and commensurate with the level of work and experience Mr.

Brown offered having been licensed since 1998 when also considering the degree of knowledge, skill, experience, and ability offered by him during the representation." *Id.* at 2.

A review of decisions from this Court and the Northern District of Mississippi reveals that reasonable attorney's fee awards vary based on the attorneys before the Court, the evidence presented in support of the fee award, and the District Judge's judgment. *See JGT, Inc. v. Ashbritt, Inc.*, No. 1:09-cv-380, 2011 WL 1323410, *2 (S.D. Miss. April 5, 2011) (declining to award requested rates of up to $500 an hour because "[t]he Court is familiar with the prevailing hourly rates in the community, and finds that $200.00 per hour is a reasonable hourly rate for senior level attorneys, taking into consideration the attorney's experience and the skill necessary to represent [clients] properly in this case."); *Alexander*, 2011 WL 1059293, at *14, 19 (awarding Watson and Norris $250 and $200 an hour, respectively, for work performed from 2006 to 2009), *aff'd* 456 F. App'x 397 (5th Cir. 2011); *Brown v. Miss. Dept. of Health*, No. 3:11-cv-146, 2013 WL 12128785, at *4 (S.D. Miss. Mar. 5, 2013) (awarding Watson and Norris $300 and $235 an hour, respectively, for work performed from 2011-2012); *Hardy*, 2010 WL 730314, at *7 (awarding $265 an hour for an attorney [Jim Waide] practicing since 1974); *In re Wayne Farms*, at Docket No. 143 (awarding $350 an hour for partners, including those practicing only since 2003 [Seth Hunter], and reciting that "[t]his Court has also previously found $350.00 per hour to be reasonable for partners in this locality and other district courts of this circuit have done likewise."); *MTW Investment Financing, LLC v. Great Western Capital Corp. of the America's, Inc.*, No. 3:07-cv-611, Docket No. 19 (S.D. Miss. Mar. 14, 2008) (awarding $200 an hour for an attorney practicing since 1991, and $100 an hour for an attorney practicing since 2005); *The Stellar Group v. Pilgrim's Pride Corp.*, No. 3:06-cv-186, Docket No. 66 (S.D. Miss. Nov. 13, 2007) (awarding $250 an hour and $260 an hour for an attorney practicing since 1994).

An appropriate rate for a principal like Brown, therefore, ranges between $200 and $350 an hour. The record evidence in our case indicating that Brown appropriately should charge $300 an hour is obviously well within this range. Obviously, no evidence to the contrary has been submitted.

As a result, the lodestar is ($300 x 67.75) for a total of $20,325.

The final step of this process requires the Court to discuss each of the *Johnson* factors and adjust the lodestar upward or downward based on that discussion. The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Penthouse Owners*, 2011 WL 6699447, at *3 (citation omitted). Again, the "most critical" of the *Johnson* factors corresponds to (8) – "the degree of success obtained." *Abner*, 541 F.3d at 377. "The United States Supreme Court has stated that many of the *Johnson* 'factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.'" *Penthouse Owners*, 2011 WL 6699447, at *4 (quoting *Hensely*, 461 U.S. at 434 n.9).

The *Johnson* factors are resolved as follows:

1. *Time and Labor Required*

The lodestar adequately reflects the amount of time and labor this case required.

2. *Novelty and Difficulty*

This case was not especially novel and did not present difficult legal or factual questions, given the run of employment cases.

3. *Skill Required for Proper Performance*

15

The lodestar adequately reflects the skill needed to litigate this employment discrimination case successfully.

4. *Preclusion of Other Employment*

The lodestar adequately reflects counsel's concerns about the preclusion of other work and general inconvenience to other clients that this trial involved.

5. *Customary Fee*

The lodestar adequately reflects Brown's customary fees.

6. *Fixed or Contingent*

Brown and Crump have an hourly rate contract. That will not affect the lodestar in this case.

7. *Time Limitations*

The lodestar adequately reflects that this case presented no unique time limitations.

8. *Degree of Success*

Crump was successful in this action. A default judgment will be granted in her favor and she will be awarded $200,540.58 in compensatory damages.

9. *Experience, Reputation, and Ability*

As discussed above, Brown's fee is appropriate based on his experience, reputation, and ability.

10. *Undesirability*

This case was relatively desirable for an attorney. No increase for undesirability is appropriate.

*11. Nature and Length of Professional Relationship*

Brown has had a long professional relationship with Crump. That fact does not support any modification of the lodestar.

*12. Award in Similar Cases*

Per above, the award is tied to similar cases, so no adjustment to the lodestar is warranted.

### 2. Expenses

Crump has incurred expenses as a part of this litigation totaling $566.65. *See* Docket No. 13-7. These expenses include a filing fee of $400, costs for process services, flash drives, and certified mail, and the fee to get Crump's medical records. *Id.* These expenses are reasonable and will be awarded.

### E. Punitive damages

Lastly, Crump has requested $500,000 in punitive damages. "A Title VII plaintiff may recover punitive damages upon proof that the defendant acted 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *E.E.O.C. v. Boh Bros. Co., L.L.C.*, 731 F.3d 444, 467 (5th Cir. 2013) (quoting 42 U.S.C. § 1981a(b)(1)). "This is a higher standard than the showing necessary for compensatory damages, satisfied in 'only a subset of cases involving intentional discrimination.'" *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)). Thus, 'not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference.'" *Id.* (quoting *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000)).

The terms "malice" and "reckless indifference" "focus on the actor's state of mind." *Kolstad*, 527 U.S. at 535. Both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* Thus, the

defendant employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages." *Id.* at 536. Intentional discrimination may not meet this standard where the employer is "unaware of the relevant federal prohibition" or "discriminates with the distinct belief that its discrimination is lawful." *Id.* at 537.

Here, the evidence about Armagost and Haselhorst show that they perceived the risk that their actions were violating federal law. They were aware that Crump filed an EEOC claim in April 2018 after overhearing them discuss that they would not keep her employed because Hollis did not "want her black ass working there." They then repeatedly pressured her to drop her EEOC charge. Crump kept Armagost and Haselhorst informed and aware of the continued discrimination she faced, but Haselhorst himself threatened Crump and the partners appeared at her house. This conduct rises to the level of acting "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

An award of punitive damages must be reasonable. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). In the circumstances of this case, a punitive damages award of $500,000 would be unreasonable. The Court instead awards $200,000 in punitive damages.

### III. Conclusion

Crump's motion for default judgment is GRANTED. The Court awards $52,012.58 in back pay, $8,528.00 in front pay, $585 in medical expenses, and $140,000 in non-economic damages for a total of $201,125.58 in compensatory damages; $200,000 in punitive damages; $20,325 in attorney's fees; and $566.65 in costs. A separate Final Judgment shall issue.

**SO ORDERED**, this the 30th day of September, 2020.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE